1

2

3                        UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
4                                 AT SEATTLE

5    MICHAEL POWERS,

6                        Plaintiff,

7          v.                                        C21-0517 TSZ

8    UNITED STATES OF AMERICA,                       ORDER

9                        Defendant.

10         THIS MATTER comes before the Court on defendant's motion to dismiss, docket

11   no. 69, and the deferred portion of plaintiff's motion for summary judgment, docket

12   no. 72.  Having reviewed all papers filed in support of, and in opposition to, the motions,

13   as well as the oral arguments of counsel, the Court enters the following Order.

14   **<u>Background</u>**

15         Plaintiff Michael Powers brings this action against defendant United States of

16   America pursuant to the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901–18,[1] to

17   recover for injuries suffered on May 2, 2019, when his boat, a 20-foot Duckworth

18   Navigator, sank in navigable waters approximately 1.2 miles west of the Deception Pass

19   Bridge.  Am. Compl. at ¶¶ 5.1, 5.4, & 6.1 (docket no. 43); <u>*see also*</u> Ex. 15 to Pipinich

20   Decl. (docket no. 73-14 at 26).  According to plaintiff, his boat was hit by "a rogue

21   _____

22   [1] The SIAA does not itself provide a cause of action; it "merely operates to waive the sovereign
     immunity of the United States in admiralty suits."  <u>*Nelson v. United States*</u>, 639 F.2d 469, 473
23   (9th Cir. 1980).

     ORDER - 1

wave," that shattered the windshields and caused the vessel to quickly fill with water. Am. Compl. at ¶ 5.3.  The boat sank at roughly 4:45 a.m.  *Id.* at ¶ 5.4.  Plaintiff's cousin Richard Seay, who was the only other person on board the boat, died twenty-to-thirty minutes after being thrown from the vessel.  *Id.* at ¶¶ 1.2 & 5.5.  Plaintiff survived and was pulled from the water about eight hours later by the crew of the P/C MACY RAE. Ex. 2 to Pipinich Decl. (docket no. 73-2 at 3).

In this litigation, plaintiff alleges that his rescue was substantially delayed by negligence on the part of the United States Coast Guard.  Defendant moves to dismiss this case for lack of subject matter jurisdiction, asserting that the "discretionary function" doctrine or exception vitiates the government's waiver of sovereign immunity.  *See* Def.'s Mot. (docket no. 69).  Plaintiff moves for partial summary judgment, asking the Court to rule as a matter of law that defendant cannot carry its burden of proving the "discretionary function" exception applies in these circumstances.  *See* Pl.'s Mot. (docket no. 72).

**Discussion**

**A.**    **Subject-Matter Jurisdiction**

For the Court to have jurisdiction over an action against the United States, a statute must grant subject-matter jurisdiction and sovereign immunity must be waived. *See Powelson v. United States*, 150 F.3d 1103, 1104 (9th Cir. 1998); *see also Arford v. United States*, 934 F.2d 229, 231 (9th Cir. 1991) ("In an action against the United States, in addition to statutory authority granting subject matter jurisdiction, there must be a waiver of sovereign immunity.").  The parties do not dispute that 28 U.S.C. § 1333

confers original and exclusive jurisdiction on the Court.  Am. Compl. at ¶ 2.1; Answer at ¶ 2.1 (docket no. 16).

Neither a private party nor the United States Coast Guard has an affirmative duty to rescue a vessel or person in distress.  _Korpi v. United States_, 961 F. Supp. 1335, 1346 (N.D. Cal. 1997); _see also_ _Bunting v. United States_, 884 F.2d 1143, 1147 (9th Cir. 1989) ("the Coast Guard is not subject to a pre-existing duty to rescue").  The law of admiralty, however, seeks to "encourage and induce men of the sea to go to the aid of life and property in distress."  _Berg v. Chevron U.S.A., Inc._, 759 F.2d 1425, 1429 (9th Cir. 1985).  As a result, Good Samaritans are afforded certain protections by the maritime rescue doctrine, and a rescuer may be held liable in tort for only (i) negligent conduct that worsens the position of the person in distress, or (ii) reckless or wanton conduct in performing the rescue.  _Id._ at 1430.

Plaintiff sues under the "worsened the situation" theory of rescuer liability.  According to plaintiff, after assuming the role of search and rescue mission coordinator ("SMC"), Am. Compl. at ¶ 5.21, the Coast Guard negligently determined, and informed other agencies with assets in the water, the media, and the public, that no vessel was in distress, thereby terminating third-party efforts to find and rescue him.  _Id._ at ¶¶ 5.31– 5.41.  Plaintiff has pleaded a claim that falls within the Court's admiralty and maritime jurisdiction.

**B.    Sovereign Immunity**

Although 28 U.S.C. § 1333 confers subject matter jurisdiction in this matter, it does not waive sovereign immunity.  _See_ _Powelson_, 150 F.3d at 1105 ("Sovereign

immunity is grounds for dismissal independent of subject matter jurisdiction.  A statute may create subject matter jurisdiction yet not waive sovereign immunity.").  The Suits in Admiralty Act, however, waives sovereign immunity in certain civil actions in admiralty:

> In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation.

46 U.S.C. § 30903(a).  Unlike the Federal Tort Claims Act ("FTCA"), which also waives sovereign immunity with regard to particular types of claims, the SIAA does not contain an explicit "discretionary function" exception.  *See* *Earles v. United States*, 935 F.2d 1028, 1031 (9th Cir. 1991).  Nevertheless, the Ninth Circuit, along with every circuit to consider the issue, has held that the SIAA incorporates an implied "discretionary function" exception.  *See* *id.* at 1031–32; *see also* *McMellon v. United States*, 387 F.3d 329, 338 & 349 (4th Cir. 2004) (en banc).  The Ninth Circuit has also made clear that the government bears the burden of proving the applicability of the "discretionary function" exception in a particular case.  *See* *Lam v. United States*, 979 F.3d 665, 673 (9th Cir. 2020).

### 1.    Two-Part Standard

In the context of the FTCA,[2] the Supreme Court has articulated a two-part standard for evaluating whether the "discretionary function" exception applies.  *United*

---

[2] The FTCA's "discretionary function" exception is set forth in 28 U.S.C. § 2680(a), which states that the FTCA does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

1 | _States v. Gaubert_, 499 U.S. 315, 322–23 (1991).  The Ninth Circuit uses this same

2 | standard in SIAA matters.  _See_ _Sutton v. Earles_, 26 F.3d 903, 907 (9th Cir. 1994).  The

3 | first inquiry is whether the act at issue was discretionary.  _Gaubert_, 499 U.S. at 322.  This

4 | test focuses on the nature of the conduct, rather than the status of the actor, and evaluates

5 | whether the employee made a judgment or choice, which would constitute the exercise of

6 | discretion, or merely followed (or failed to follow) a federal statute, regulation, or policy,

7 | which prescribed a "course of action" for the employee and left the employee "no rightful

8 | option but to adhere to the directive." _Id._ (quoting _Berkovitz v. United States_, 486 U.S.

9 | 531, 536 (1988)).  If the conduct was discretionary, then the Court must engage in the

10 | second inquiry, which is whether the governmental decision was "of the kind that the

11 | discretionary function exception was designed to shield." _Id._ at 322–23.  The purpose of

12 | the "discretionary function" doctrine is to "prevent judicial 'second-guessing' of

13 | legislative and administrative decisions grounded in social, economic, and political policy

14 | through the medium of an action in tort." _Id._ at 323 (quoting _United States v. S.A._

15 | _Empresa de Viacao Aerea Rio Grandense (Varig Airlines)_, 467 U.S. 797, 814 (1984)).

16 | Only actions or omissions that are "based on considerations of public policy" are

17 | protected by the "discretionary function" exception.  _Id._ (quoting _Berkovitz_, 486 U.S. at

18 | 537); _see also_ _Sutton_, 26 F.3d at 907 (summarizing the two-step "discretionary function"

19 | test, quoting _Kennewick Irrigation Dist. v. United States_, 880 F.2d 1018, 1025 (9th Cir.

20 | 1989)).

21 |

22 |

23 |

1          **2.**     <u>**Characterizing Plaintiff's Claim**</u>

2         For purposes of determining whether the "discretionary function" exception

3 applies, "the question of <u>*whether*</u> the government was negligent is irrelevant," but "the

4 question of <u>*how*</u> the government was negligent remains 'critical,'" and "determining the

5 precise action the government took or failed to take (that is, how it is alleged to have been

6 negligent) is a necessary predicate to determining whether the government had discretion

7 to take that action."  <u>*See*</u> <u>*Young v. United States*</u>, 769 F.3d 1047, 1054 (9th Cir. 2014)

8 (emphasis in original).  In <u>*Young*</u>, a woman sustained severe injuries when she fell into a

9 twelve-foot-deep hole covered by snow near the visitor center at Mount Rainier National

10 Park.  <u>*Id.*</u> at 1050.  The Ninth Circuit observed that, if the plaintiffs in <u>*Young*</u> had broadly

11 alleged that the National Park Service ("NPS") "was negligent in failing to warn of any

12 danger, whether known or unknown and however created," their claim would likely have

13 been barred by the "discretionary function" doctrine.  <u>*Id.*</u> at 1054.  The plaintiffs in

14 <u>*Young*</u>, however, pleaded more narrowly that "NPS staff failed to warn of a known, latent

15 hazard that the agency itself created."  <u>*Id.*</u>  Given <u>*how*</u> plaintiffs alleged the NPS was

16 negligent, the <u>*Young*</u> Court held that dismissal of plaintiff's claim constituted reversible

17 error because the NPS decision at issue was not susceptible to consideration of the

18 various policies identified by the government.  <u>*Id.*</u> at 1057–59.

19         Contrary to defendant's argument that plaintiff's claim in this matter should be

20 interpreted in a general way as alleging negligence in how the Coast Guard conducted its

21 search and rescue investigation, the Ninth Circuit's reasoning in <u>*Young*</u> requires the Court

22 to treat plaintiff's claim as alleging, primarily, that the Coast Guard was negligent in

23

deciding that no vessel was in distress.  *See id.* at 1058 ("We have little doubt that NPS

staff members make discretionary decisions every day about managing snow, prioritizing

inspections, and responding to hazards.  But those decisions are not at issue in this case,

so we reject the government's efforts to make this case about them."); *see also In re*

*Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995) ("The proper question to ask is not

whether the Government as a whole had discretion at any point, but whether its allegedly

negligent agents did in each instance.").  According to the operative pleading, within

minutes after plaintiff's vessel sank, a 911 caller named David Shell reported seeing an

outbound boat disappear and perhaps capsize in rough seas.[3]  Am. Compl. at ¶ 5.19.

Shortly thereafter, a Coast Guard watchstander spoke directly with Shell and, as a result,

an urgent marine information broadcast ("UMIB") was issued, asking vessels in the area

to provide further information.  *Id.* at ¶¶ 5.22 & 5.25; *see also* Pl.'s Mot. at 6 (docket

no. 72) (citing Ex. 4 to Pipinich Decl. at 12-10-07_05-02-19_D25s.wav).  The P/C

KRAKEN responded to the UMIB and reported seeing a 22- or 24-foot white-on-silver

---

[3] The Coast Guard assigns one of three phases to each potential emergency:  (i) uncertainty;
(ii) alert; or (iii) distress.  Am. Compl. at ¶ 5.15.  Plaintiff alleges that the incident relating to
Shell's 911 call was designated as "distress" phase.  *Id.* at ¶ 5.24.  Defendant asserts that the
incident was classified as "alert" phase, and explains that Coast Guard watchstander Michael J.
Allen entered "distress" phase in the Marine Information for Safety and Law Enforcement
("MISLE") logging system as a placeholder, intending to update it later.  *See* Def.'s Resp. at 2 &
n.11 (docket no. 78).  In his deposition, however, Allen stated that he did not recall entering
"distress" phase in the MISLE log.  Allen Dep. at 33:11–14, 47:1–3, 57:5–14, & 137:14–15
("Q: But you chose to enter this in MISLE as a distress; correct?  A: Apparently I did.  Again, I
don't remember."), Ex. R to Perrygo Decl. (docket no. 79-7).  Defendant's contention that Allen
misidentified the emergency phase with a plan of subsequently correcting the MISLE entry is
unsupported by the portions of the record cited by defendant.  *See* Def.'s Resp. at 2 n.11.
Whether the incident was categorized as "alert" or "distress" is a factual question that cannot be
decided in motion practice.

hard-top boat inbound and not in distress.  Am. Compl. at ¶ 5.26.  The Coast Guard concluded that the outbound vessel seen by Shell and the inbound boat observed and contacted by the KRAKEN were the same, and it issued another UMIB indicating that no vessel was in distress.  *See id.* at ¶¶ 5.29 & 5.31; *see also* Ex. 4 to Pipinich Decl. at 12-33-30_05-02-19_D14s.wav (transcribed at docket no. 91-1 at 9:19–22).  The Coast Guard also transmitted "no vessel in distress" messages to the Swinomish Tribal Police Department ("STPD") and North Whidbey Fire and Rescue ("NWFR").  Am. Compl. at ¶¶ 5.40–5.41.

Plaintiff alleges that the Coast Guard acquired but ignored certain information that cast doubt on whether the boat with which the KRAKEN had communicated was the same vessel about which Shell had placed his 911 call.  According to plaintiff, (i) Shell was uncertain about his description of the possibly capsized boat, given the weather and dark conditions, (ii) Shell told the Coast Guard that his companion believed he saw the distressed vessel's lights under water, and (iii) the KRAKEN indicated that at least five other boats headed out to sea on the morning of May 2, 2019.  *See* Am. Compl. at ¶¶ 5.27–5.29.  Plaintiff criticizes the Coast Guard for failing to account for the other boats before declaring that no vessel was in distress, and contends that, but for the Coast Guard's "false alert" broadcasts, other agencies with vessels in the vicinity, namely the STPD and NWFR, would have continued to search for him.  *Id.* at ¶¶ 5.29–5.41.

### 3.   **Defendant's Rule 12(b)(1) Motion**

With the proper scope of plaintiff's negligence claim in mind, the Court turns to defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1),

which presents both facial and factual jurisdictional challenges.  _See_ Def.'s Mot. at 5

(docket no. 69).  A facial attack asserts that the allegations of the complaint are

insufficient on their face to invoke federal jurisdiction, while a factual challenge disputes

the truth of the allegations in the complaint that would otherwise support subject-matter

jurisdiction.  _See_ _Safe Air for Everyone v. Meyer_, 373 F.3d 1035, 1039 (9th Cir. 2004).

With respect to a facial challenge under Rule 12(b)(1), a plaintiff is entitled to the same

safeguards that apply to a Rule 12(b)(6) motion to dismiss for failure to state a claim.  _See_

_Friends of Roeding Park v. City of Fresno_, 848 F. Supp. 2d 1152, 1159 (E.D. Cal. 2012).

The factual allegations of the complaint are presumed to be true, all reasonable inferences

are drawn in the plaintiff's favor, and matters outside the pleading may not be considered

without converting the motion into one for summary judgment.  _Leite v. Crane Co._, 749

F.3d 1117, 1121 (9th Cir. 2014).  In contrast, when resolving a factual attack on

jurisdiction, the Court need not accept the facts set forth in the operative pleading and

may review evidence beyond the complaint.  _Safe Air_, 373 F.3d at 1039; _see_ _White v. Lee_,

227 F.3d 1214, 1242 (9th Cir. 2000).  Dismissals on the basis of factual jurisdictional

challenges are, however, rare,[4] and they are warranted only when the asserted federal

claim "clearly appears to be immaterial and made solely for the purpose of obtaining

federal jurisdiction" or "is wholly insubstantial and frivolous."  _Safe Air_, 373 F.3d at

1039 (quoting _Bell v. Hood_, 327 U.S. 678, 682–83 (1946)).

---

[4] Although the Court may resolve certain factual disputes to determine whether jurisdiction
exists, when the issue of subject-matter jurisdiction is intertwined with an element of the
plaintiff's claim, dismissal under Rule 12(b)(1) is not appropriate.  _Safe Air_, 373 F.3d at 1039–
40; _see also_ _Leite_, 749 F.3d at 1121–22 & n.3.

1            a.      **Discretionary Decision**

2        With respect to both types of jurisdictional attack, the Court reaches the same

3   conclusion at step one of the "discretionary function" exception analysis, namely that

4   the alleged negligence, as framed by plaintiff, involved discretionary conduct.  The

5   operative pleading references various provisions of the Coast Guard's standards, _see_

6   Am. Compl. at ¶¶ 5.12–5.18, but it cites no statute, regulation, or policy governing

7   whether or how the Coast Guard, in the search and rescue context, may form a judgment

8   that no vessel is in distress.  Although defendant has submitted over 1,350 pages from

9   various search and rescue manuals and plans, _see_ Exs. A–F to Anders Decl. (docket

10  no. 70), neither party has referenced any section that might apply to the scenario at issue.

11  Plaintiff characterizes the matching of vessels as an exercise (or poor exercise) of

12  professional skill or judgment and/or deductive reasoning.  _See_ Pl.'s Resp. at 10–12, 16,

13  & 19 (docket no. 86).  Thus, plaintiff agrees that the Coast Guard watchstander on duty at

14  the time of Shell's 911 call was not constrained by any particular governmental

15  "directive" or prescribed "course of action."  _See Gaubert_, 499 U.S. at 322.  For purposes

16  of both the facial and factual jurisdictional attacks raised by defendant, the Court

17  concludes that, with respect to the determination that no vessel was in distress, the first

18  prong of the "discretionary function" exception is met.

19            b.      **Susceptible to Policy Analysis**

20        The kinds of governmental decisions that the "discretionary function" doctrine is

21  intended to immunize have been the source of much jurisprudence.  Plaintiff relies

22  heavily on _Huber v. United States_, 838 F.2d 398 (9th Cir. 1988).  At oral argument,

23

1    defendant's counsel essentially conceded that, if the Ninth Circuit's decision in _Huber_ is

2    still valid and binding, it precludes the Court from granting defendant's motion to

3    dismiss.  _See_ Tr. (Jan. 19, 2023) at 17:17–19 (docket no. 97) ("If _Huber_ was still good

4    law, the presumption that I would have is that the Court would, more likely, be inclined

5    to deny our motion . . . .").  Pursuant to _Huber_, as well as other Ninth Circuit opinions,

6    some of which are criticized by defendant, the Court concludes that defendant has not

7    met its burden of showing the actions or omissions giving rise to plaintiff's negligence

8    claim were based on or susceptible to a policy analysis.

9         In _Huber_, the Ninth Circuit rejected the government's assertion that the

10   "discretionary function" exception vitiated the SIAA's waiver of sovereign immunity.

11   The _Huber_ Court reasoned that the Coast Guard's conduct was not the result of a policy

12   decision about the allocation of rescue resources, but rather the allegedly negligent

13   execution of an already implemented course of action.[5]  838 F.2d at 400–01.  The Coast

14   Guard made the policy decision to assist the KUHUSHAN and then failed to monitor the

_____

16   [5] In _Huber_, a sailboat known as the KUHUSHAN encountered foul weather and contacted the
     Coast Guard.  838 F.2d at 399.  The Coast Guard indicated that its vessels were already busy
17   with rescue activities, but it set up a schedule for maintaining regular radio contact with the
     KUHUSHAN.  _Id._  At the Coast Guard's suggestion, the KUHUSHAN attempted to take shelter
18   alongside the M/V MARITIME PRIDE, but it was thrown against the anchored freighter,
     dismasted, and holed.  _Id._  As the KUHUSHAN drifted out of sight, the master of the
19   MARITIME PRIDE mistakenly assumed that a nearby Coast Guard helicopter was rendering
     assistance and did not inform the Coast Guard about the failure to secure the KUHUSHAN.  _Id._
20   The Coast Guard never inquired about the status of the MARITIME PRIDE's attempt to throw a
     line and did not investigate when the KUHUSHAN missed the next scheduled communication
21   check.  _Id._  When the KUHUSHAN began to sink, it called out "May Day" on Channel 13,
     which the Coast Guard had instructed it to use instead of the usual emergency frequency
22   (Channel 16), but no Coast Guard personnel heard the call because certain employees were not at
     their assigned stations.  _Id._ at 399–400.  Of the three sailors on board the yacht, one successfully
     swam to shore and the other two drowned.  _Id._ at 400.

23

1   prescribed radio channel and failed to investigate when the KUHUSHAN missed a

2   scheduled communication check.  _Id._ at 401.  The Ninth Circuit concluded that the Coast

3   Guard's actions or omissions were not "of the nature and quality intended to be

4   unreviewable under the discretionary function exception."  _Id._[6]

5        In subsequent decisions, all of which post-date _Gaubert_, the Ninth Circuit has

6   consistently differentiated between decisions implicating policy concerns, which are

7   shielded by the "discretionary function" exception, and conduct that was allegedly

8   inconsistent with the proper exercise of professional judgment or technical skill, which is

9   not similarly protected.  _See_ _Kim v. United States_, 940 F.3d 484, 489 (9th Cir. 2019)

10  ("scientific and professional judgment is all the [Yosemite National] Park's [tree] rating

11  system requires"); _Whisnant v. United States_, 400 F.3d 1177, 1183 (9th Cir. 2005)

---

[6] Defendant asserts that _Huber_ is "no longer good law" because it employed a planning-versus-operational distinction that was rejected by the Supreme Court in _Gaubert_.  Def.'s Resp. at 11 n.60 (docket no. 78).  Defendant's contention has no merit.  In _Gaubert_, which was brought pursuant to the FTCA, a shareholder of an insolvent savings and loan association sued for negligence on the part of federal regulators that "undertook to advise about and oversee certain aspects of the operation" of the thrift institution.  499 U.S. at 318.  The district court dismissed the shareholder's claims, finding that the federal regulators' actions fell within the "discretionary function" exception to the FTCA.  _Id._ at 320.  The Fifth Circuit reversed in part, differentiating between "policy decisions," which were protected by the exception, and "operational actions," which were not.  _Id._ at 321.  The Supreme Court rejected the Fifth Circuit's analysis, explaining that:

> A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions.  Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest.  Discretionary conduct is not confined to the policy or planning level.

_Id._ at 325.  Contrary to defendant's argument, _Huber_ did not rely on the operational (i.e., day-to-day management), as opposed to planning, nature of the Coast Guard's conduct or the status of the Coast Guard personnel involved.  Rather, the result in _Huber_ reflects that no policy rationale could support failing to monitor the designated radio frequency or failing to attempt to determine why the sailboat missed its scheduled communication check.

1   ("Cleaning up mold involves professional and scientific judgment, not decisions of

2   social, economic, or political policy."); _Bear Medicine v. United States_, 241 F.3d 1208,

3   1217 (9th Cir. 2001) ("the crux of our holdings . . . is that a failure to adhere to accepted

4   professional standards is not 'susceptible to a policy analysis'"); _see_ _In re Glacier Bay_,

5   71 F.3d at 1452 ("Because what discretion is left [in preparing nautical charts] is of a

6   scientific nature, we conclude that these actions are not covered by the discretionary

7   function exception."); _see also_ _Chadd v. United States_, 794 F.3d 1104, 1112 (9th Cir.

8   2015) ("implementation of a government policy _is_ shielded where the _implementation_

9   _itself_ implicates policy concerns" (emphasis in original)).[7]

10        Defendant asserts that _Kim_, _Whisnant_, _Bear Medicine_, and _Huber_ are not binding

11  on this Court in light of _Lam v. United States_, 979 F.3d 665 (9th Cir. 2020).  _See_ Def.'s

12  Resp. at 11–13 (docket no. 78); Def.'s Reply at 10 (docket no. 81).  Defendant is

13  mistaken.  _Lam_ is a three-judge panel decision and, despite defendant's suggestion, _Lam_

14  does not overrule _Kim_, _Whisnant_, _Bear Medicine_, and/or _Huber_.  _See_ _Gonzalez v._

15  _Arizona_, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (citing _Hart v. Massanari_, 266

16  F.3d 1155, 1170 (9th Cir. 2001)); _see also_ _McMellon_, 387 F.3d at 334 ("when there is an

17  irreconcilable conflict between opinions issued by three-judge panels of this court, the

18  first case to decide the issue is the one that must be followed, unless and until it is

19

20

21  [7] In _Chadd_, which concerned a visitor to the Olympic National Park who was fatally gored by a
    mountain goat, the Ninth Circuit explained that, unlike in _Whisnant_, in which "_no_ legitimate
    reason [existed] for the commissary not to eliminate the toxic mold," 794 F.3d at 1112 (emphasis
22  in original), policy reasons supported the park rangers' implementation of non-lethal methods of
    managing the goats, which were considered "appealing, iconic animal[s]" and "an attraction" for
23  park visitors, _id._ at 1113.

1 overruled by this court sitting _en banc_ or by the Supreme Court"). In addition, the Court

2 perceives no inconsistency between _Lam_ and the other panel decisions. In trying to

3 convince the Court otherwise, defendant cites to a concurrence, and not the majority

4 decision, in _Lam_. _See_ Def.'s Resp. at 12–13 (quoting 979 F.3d at 683–87 (Royal, D.J.,

5 concurring)). District Judge Royal's personal views are not the law of the Ninth Circuit.

6 Ninth Circuit jurisprudence requires defendant, in seeking to demonstrate that the

7 "discretionary function" exception applies, to identify "reasonable support in the record

8 for a court to find, without imposing its own conjecture, that a decision was policy-based

9 or susceptible to policy analysis." _Bear Medicine_, 241 F.3d at 1216. With respect to the

10 conduct alleged in this matter to be negligent (i.e., the judgment that no vessel was in

11 distress), defendant does not point to any allegation of the Amended Complaint

12 (for purposes of its facial jurisdictional challenge), and has not identified any evidence

13 outside the operative pleading (for purposes of its factual attack), indicating that the

14 Coast Guard made (or could have made) the type of policy-related choices that the

15 "discretionary function" doctrine was designed to insulate from liability. Instead,

16 defendant proffers the type of post-hoc rationalizations against which the Ninth Circuit

17 warned in _Bear Medicine_. _See id._[8] Defendant asserts that the Coast Guard must make

18

19 _____

20 [8] _Bear Medicine_ rejected the type of argument for which defendant has cited _Miller v. United States_, 163 F.3d 591 (9th Cir. 1998). The _Bear Medicine_ Court identified ways in which the government misconstrued _Miller_'s language that a challenged "decision need not be actually

21 grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." _See_ 241 F.3d at 1216 (quoting _Miller_, 163 F.3d at 593). In _Bear Medicine_, the Ninth Circuit

22 explained that "our inquiry into the nature of a decision is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield."

23 _Id._ The _Bear Medicine_ Court made clear that _Miller_'s paraphrasing of a passage from _Gaubert_

ORDER - 14

1   "on-the-fly, life-or-death decisions, often with limited information, while contempo-

2   raneously considering weather and balancing safety to Coast Guard personnel."  Def.'s

3   Mot. at 17 (docket no. 69).  Defendant further explains that the Coast Guard has to

4   balance its search and rescue missions with other missions both nationally and globally,

5   given its limited resources, personnel, and budget, _id._ at 17–18, and it must sometimes

6   respond to multiple search and rescue incidents simultaneously, requiring watchstanders

7   to make difficult choices about how to respond, _id._ at 19–20.  Defendant, however, fails

8   to link these economic and prudential considerations to the Coast Guard's decision at

9   issue in this litigation.

10        More importantly, the submitted portions of the deposition testimony of the

11   watchstander on duty (Chief Petty Officer Alexander I. Polyak) and the search and rescue

12   mission coordinator (Lieutenant Commander D. Blair Sweigart) include no discussion of

13   any policy-based reason for the decision that no vessel was in distress.  Indeed, Chief

14   Polyak professed a lack of memory about almost every significant detail.[9]  Commander

15   Sweigart explained that the oncoming command duty officer provided a briefing about

16

17   _____

18   "should not be used to allow the Government to create after-the-fact justifications for the purpose
     of liability protection."  _Id._

19   [9] _See_ Polyak Dep. at 26:7–8 ("Q: Do you remember May 2, 2019? A: Specifically no."), 27:5–9
     ("I don't remember how the initial information came in to us. . . .  I can't recall specifically what
20   the initial report was, or where it came from."), 27:15–17 ("Q: How were you gathering
     information? A: I can't remember, but again it's typically phone or radio."), 31:6–9 ("I recall
21   there being someone that reported a vessel in that same vicinity that appear[ed] as though they
     were getting tossed around by the weather.  And, ultimately, it turned around to head back into
22   port."), 31:12–13 ("Q: [W]hat happened next? A: I can't remember"), 31:17–18 ("Q: Do you
     remember how this case resolved? A: No. It was near the end of my watch. I can't remember if it
23   was resolved before or after I left."), Ex. M to Anders Decl. (docket no. 70-12).

ORDER - 15

1    the incident via phone and indicated that it was a false alert.  Sweigart Dep. at 8:17–23,

2    11:25–12:6, & 13:1–8, Ex. K to Anders Decl. (docket no. 70-11).  Commander Sweigart

3    apparently asked follow-up questions, but does not recall what they were.  _Id._ at 9:24–

4    10:1.

5         Plaintiff has submitted excerpts of the transcript of the Rule 30(b)(6) deposition of

6    Commander Matthew Mitchell, the Chief of the Policy Division for the Coast Guard's

7    Office of Search and Rescue.  _See_ Mitchell Dep., Ex. 17 to Pipinich Decl. (docket

8    no. 73-16).  Commander Mitchell testified that the "principal reason" for not deploying

9    resources to search for plaintiff's boat was "the belief that they had a corroborated report

10   that the vessel that was initially reported was one and the same as the vessel that had

11   turned around."  _Id._ at 156:18–22.  When asked if any other reasons existed, Commander

12   Mitchell replied, "None that I know of."  _Id._ at 157:13–16.  Commander Mitchell also

13   opined that the SMC on the morning of May 2, 2019, "did not meet the standard of care."

14   _Id._ at 128:4–5.  According to Commander Mitchell, the SMC should have "ask[ed] more

15   questions and more thoroughly underst[oo]d the facts of the case before considering the

16   case closed as a false alert."  _Id._ at 128:5–7.[10]  Whether the Coast Guard's actions or

17

18   ───────────────────────

19   [10] Defendant asserts that it objected to plaintiff's counsel's line of questioning as lacking a
     proper foundation and calling for a legal conclusion, _see_ Def.'s Resp. at 23 (docket no. 78), but
     the objection actually stated was merely to the form of the inquiry as "compound," _see_ Mitchell
20   Dep. at 127:15–128:1, Ex. P1 to Perrygo Decl. (docket no. 79-5).  Defendant's legal-conclusion
     objections had been interposed a bit earlier with regard to broader questions about whether
21   Commander Mitchell had any opinions concerning when an SMC violates the standard of care.
     _Id._ at 122:7–20.  After Commander Mitchell expressed the view that the SMC did not behave as
22   he would have expected, defendant's attorney noted that "he's just giving you his opinions" and
     clarified that defendant did not intend on "putting him up [as a witness] as to standard of care."
23   _Id._ at 128:12–17.

ORDER - 16

1   omissions were negligent is a factual question reserved for trial, but Commander

2   Mitchell's testimony that the SMC failed to satisfy the Coast Guard's own standard of

3   care and that no reason other than the boat-matching mistake existed for ceasing search

4   and rescue efforts undermines defendant's contention that the Coast Guard's decisions in

5   this matter were based on or susceptible to policy analysis.  Defendant's Rule 12(b)(1)

6   motion is therefore DENIED.

7         **4.      Plaintiff's Motion for Partial Summary Judgment**

8         Plaintiff asks the Court to rule that the "discretionary function" exception defense

9   lacks merit.  In considering plaintiff's motion, the Court must apply the familiar summary

10  judgment standard, which requires the absence of any genuine dispute of material fact

11  and a showing that the moving party is entitled to judgment as a matter of law.  _See_ Fed.

12  R. Civ. P. 56(a).  To survive a motion for summary judgment, the adverse party must

13  present affirmative evidence, which "is to be believed" and from which all "justifiable

14  inferences" are to be favorably drawn.  _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242,

15  255–57 (1986).  When the record, taken as a whole, could not lead a rational trier of fact

16  to find for the non-moving party on matters as to which such party will bear the burden of

17  proof at trial, summary judgment is warranted.  _See_ _Matsushita Elec. Indus.  Co. v. Zenith_

18  _Radio Corp._, 475 U.S. 574, 587 (1986); _see also_ _Celotex Corp. v. Catrett_, 477 U.S. 317,

19  322–23 (1986).  The Court is not persuaded that plaintiff has satisfied the standard for

20  summary judgment.

21        To borrow the metaphor used by plaintiff's attorney during oral argument, the case

22  law involving the "discretionary function" exception can be separated into the following

23

1   four "buckets."  The first two buckets contain decisions favorable to defendant, namely

2   (1) cases in which a negligence claim was dismissed on the government's motion,[11] and

3   (2) cases in which the plaintiff lost on the merits of a negligence claim.[12]  The last two

4   buckets include opinions favorable to plaintiff, which are (3) cases in which a

5   Rule 12(b)(1) dismissal or immunity-based summary judgment was reversed on appeal,[13]

6

---

7   [11] *See Gaubert*, 499 U.S. at 320 (government's motion to dismiss granted by district court);
    *Lam*, 979 F.3d at 670 (government's Rule 12(b)(1) motion granted by district court); *Gonzalez v.*
8   *United States*, 814 F.3d 1022, 1026 (9th Cir. 2016) (government's Rule 12(b)(1) motion granted
    by district court); *Chadd*, 794 F.3d at 1108 (government's Rule 12(b)(1) motion granted by
9   district court); *Miller*, 163 F.3d at 592–93 (government's motion for summary judgment granted
    by district court); *In re Moore*, 488 F. Supp. 3d 231 (D. Md. 2020) (granting government's
10  Rule 12(b)(1) motion, construing it as asserting a facial jurisdictional challenge); *Lane v. United*
    *States*, No. 17-12356, --- F. Supp. 3d ---, 2020 WL 1427419 (D. Mass. Mar. 24, 2020) (granting
11  government's Rule 12(b)(1) motion, but pursuant to a summary judgment standard because the
    factual jurisdictional attack and the substantive claims were intertwined); *Azile v. United States*,
12  No. 06-16, 2008 WL 4911205 (D.V.I. Nov. 13, 2008) (granting government's motion to dismiss,
    applying a facial-challenge standard); *see also Jahr v. United States*, 259 F. Supp. 3d 1158
13  (W.D. Wash. 2017) (granting in part and denying in part government's motion for summary
    judgment); *Turner v. United States*, 869 F. Supp. 2d 685, 689–90 (E.D.N.C. 2012) (ruling in
14  government's favor on motion for summary judgment, but placing the burden on the plaintiff to
    prove that the "discretionary function" exception did not apply), *aff'd on other grounds*, 736
    F.3d 274 (4th Cir. 2013).

15  [12] *See Wade v. United States*, No. C-09-1976, 2012 WL 2050359 (N.D. Cal. June 6, 2012)
    (ruling, after a bench trial, that the Coast Guard was not negligent, which rendered moot the
16  issue of the "discretionary function" exception); *see also* Transcript at 36, *In re Avena*, No. 21-
    cv-515 (D.N.J. Nov. 2, 2022), Ex. Q to Anders Decl. (docket no. 71-2) (granting government's
17  motion to dismiss, reasoning that, because "a private party is not [e]ncumbered by any duty to
    rescue a person or vessel in distress," the Coast Guard had no obligation to pass along
18  information hypothetically supplied by a capsized-boat-captain's father, and because the plaintiff
    had not shown that she could maintain a similar action against a private person, she could not
19  rely on the SIAA's waiver of sovereign immunity in pursuing a negligence claim against the
    United States (citing 46 U.S.C. § 30903, *Patentas v. United States*, 687 F.2d 707, 715 (3d Cir.
20  1982), and *Frank v. United States*, 250 F.2d 178, 180 (3d Cir. 1957))); *In re United States (U.S.*
    *Coast Guard Cutter POINT JUDITH)*, No. CV86-4186, 1987 WL 90270 (C.D. Cal. June 5,
21  1987) (granting summary judgment in favor of government, ruling that Coast Guard had no
    affirmative duty to initiate a rescue and did not negligently worsen the decedent's condition).

22  [13] *See Kim*, 940 F.3d at 486–87 & 494 (reversing district court's dismissal of negligence-based
    claims); *Young*, 769 F.3d at 1050–52 (reversing district court's Rule 12(b)(1) dismissal of the
23  plaintiffs' negligence claim); *Whisnant*, 400 F.3d at 1179 (reversing district court's Rule 12(b)(1)

1   and (4) cases in which the "discretionary function" exception was deemed inapplicable

2   and the government was held liable.[14]   All of the cases in the latter category involved

3   _____

4   dismissal of claim relating to toxic mold); _Bear Medicine_, 241 F.3d at 1211–13 (reversing
    district court's grant of summary judgment in favor of government); _In re Glacier Bay_, 71 F.3d

5   at 1449–54 (affirming in part and reversing in part district court's dismissal, holding that certain
    allegations of negligence were not barred by the "discretionary function" exception); _see also_

6   _Thames Shipyard & Repair Co. v. United States_, 350 F.3d 247 (1st Cir. 2003).  Defendant cites
    _Thames_, but as plaintiff observes, the opinion undermines defendant's position.  In _Thames_, a

7   144-foot fishing vessel called the F/V NORTHERN VOYAGER dropped a rudder and began
    flooding with water.  _Id._ at 249.  The captain radioed the Coast Guard, which launched a 41-foot

8   rescue boat, followed by a 47-foot one.  _Id._ at 250.  Eight members of the NORTHERN
    VOYAGER crew were evacuated onto the 41-foot boat, leaving behind the captain, the engineer,

9   and the first mate, joined by two Coast Guardsmen, all of whom worked to pump water from the
    NORTHERN VOYAGER and keep it afloat, but to no avail.  _Id._  The vessel developed a port

10  side list, and the rescue team on the Coast Guard's 47-foot boat ordered that the NORTHERN
    VOYAGER be abandoned, over the captain's objections; the ship capsized about an hour later.

11  _Id._ at 250–51.  Meanwhile, a commercial salvor, who heard radio traffic about the rescue efforts,
    had advised the Coast Guard that he had dive gear and pumps and was ready and able to assist.

12  _Id._ at 251.  His offer was rebuffed.  _Id._ at 251–52.  In suing for the loss of the fishing vessel, the
    plaintiffs alleged that (i) the Coast Guard exceeded its authority by compelling the NORTHERN

13  VOYAGER's captain to leave the ship against his will, and (ii) the Coast Guard negligently
    interfered with the commercial salvor's efforts and deprived the NORTHERN VOYAGER of a

14  possible source of assistance in its time of peril.  _Id._ at 252–53.  The First Circuit concluded that
    the first theory was precluded by the "discretionary function" exception, but the second basis of

15  liability was not.  _Id._ at 255–67.  The First Circuit reasoned that "[t]he government has never
    advanced any protected policy reasons, and we can think of none, to explain its conduct vis-a-vis

16  the commercial salvor.  Rather, to the extent that conscious decisions were made, rather than
    mistakes, oversights, or misstatements, the decisions appear to be _ordinary professional_

17  _judgments_."  _Id._ at 260 (emphasis added).  The district court's grant of summary judgment was
    reversed in part, and the matter was remanded for further proceedings concerning the plaintiffs'
    second theory of liability.  _Id._ at 266–67.

18  [14] _Sutton_, 26 F.3d at 907–11 (affirming district court's finding after trial that the "discretionary
    function" exception did not insulate the United States from liability for failing to illuminate a

19  mooring buoy and failing to adequately post a speed limit, reasoning that the Navy's failure to
    warn of an obstruction to navigation that it had placed in navigable waters "was not of a kind

20  involving social, economic, or political policy"); _Huber_, 838 F.2d at 400–03 (agreeing with
    district court, which held after a bench trial that government could be held liable because its
    conduct was not the result of a policy decision, but remanding for further proceedings in light of

21  unrelated evidentiary errors); _see also_ _Hurd v. United States_, 134 F. Supp. 2d 745, 769 (D.S.C.
    2001) (concluding after a bench trial that the "discretionary function" exception did not apply).

22  Defendant contends that _Hurd_ conflicts with _Gaubert_ and Ninth Circuit law, and that _Hurd_ was
    wrongly decided.  _See_ Def.'s Mot. at 23–24 (docket no. 69).  Defendant's assertion that _Hurd_

23  misapplies a planning-versus-operational distinction lacks merit for the reasons discussed earlier

1  decisions made after bench trials.  Plaintiff has not cited any case in which summary

2  judgment was granted against the government and the "discretionary function" exception

3  defense was stricken in advance of trial.  The absence of any precedent in which the

4  government was precluded from presenting its immunity-based defense at trial weighs

5  against affording plaintiff the relief he has requested.

6          Moreover, although plaintiff's counsel focused during oral argument on the boat-

7  matching theory of negligence, plaintiff articulated other reasons for liability in his

8  operative pleading and dispositive motion briefing, and the Court cannot conclude, as a

9  matter of law, that defendant has failed to prove the "discretionary function" exception

10  defense as to those grounds.  For example, plaintiff alleges that, in planning a search,

11  Coast Guard personnel must use the Search and Rescue Optimal Planning System

12  ("SAROPS") or another means of calculating data, and that neither SAROPS nor a

13  different method were employed in this matter.  Am. Compl. at ¶¶ 5.16 & 5.23.  Plaintiff

14  also asserts that the Coast Guard violated its own policies by closing the case before

15  plaintiff was located.  *See id.* at ¶¶ 5.18 & 6.6–6.8.  In support of these accusations,

16

---

17  in connection with *Huber*, on which *Hurd* relies.  *See supra* note 6.  Moreover, contrary to
defendant's suggestion, the District of South Carolina has not rejected the reasoning in *Hurd*; the

18  case defendant cites for this proposition, *Anderson v. United States*, No. 12-3203, 2016 WL
320076 (D.S.C. Jan. 27, 2016), is an FTCA case that never mentions *Hurd*, does not concern the

19  Coast Guard or a search-and-rescue operation, and constitutes merely another district judge's
ruling in a different matter.  Finally, defendant's criticism that the *Hurd* Court did not specify

20  which Coast Guard policy required its personnel, after hearing a mayday broadcast and a report
of someone in the water screaming for help, to continue search and rescue efforts until at least

21  dawn does not establish that *Hurd* was "wrong as a matter of fact."  *See* Def.'s Mot. at 24.
Indeed, the Fourth Circuit affirmed the finding of liability in *Hurd* because the evidence

22  adequately supported the district court's conclusion that the Coast Guard's termination of the
search before sunrise was "the exercise of no care at all," constituting wanton and reckless

23  conduct.  *See Hurd v. United States*, 34 F. App'x 77, 84 (4th Cir. 2002).

1    plaintiff relies on the U.S. Coast Guard Addendum to the United States National Search

2    and Rescue Supplement to the International Aeronautical and Maritime Search and

3    Rescue Manual ("COMDTINST M16130.2F") [hereinafter "Addendum"].  The extent to

4    which the Addendum limits the discretion of Coast Guard personnel constitutes a factual

5    question precluding summary judgment regarding the first prong of the "discretionary

6    function" exception standard.[15]

7          Summary judgment is also inappropriate because plaintiff, as the moving party,

8    has not shown that, if he loses the first mandatory-versus-discretionary-decision battle,

9    defendant could not identify at least one policy reason for not using SAROPS or an

10   alternative tool or for prematurely closing a case.  Defendant asserts that, if the use of

11   SAROPS is always required, the Coast Guard's responses will degrade because SAROPS

12   might not be the most effective expenditure of a watchstander's time and effort in each

13

14   _____

15   [15] The Addendum contains a disclaimer, which states in relevant part that it "creates no duties,
     standard of care, or obligations to the public and should not be relied upon as a representation by
16   the Coast Guard as to the manner of proper performance in any particular case."  Addendum at 2,
     ¶ 4(d), Ex. E to Anders Decl. (docket no. 70-5 at 4).  The Addendum, however, also has two
17   notes to readers, the first of which explains that the terms "must" and "shall" are "mandatory,"
     and "require compliance or action," and the second of which states that "[i]tems highlighted by
18   ***bold/italic*** text are policy."  *Id.* at xvii (docket no. 70-5 at 25) (emphasis in original).  Defendant
     cites district court decisions that relied on the Addendum's disclaimer to conclude that the Coast
19   Guard has discretion to decide whether to render assistance and how to conduct a search and
     rescue operation.  *See In re Moore*, 488 F. Supp. 3d at 239–40; *Lane*, 2020 WL 1427419, at *6;
20   *Azille*, 2008 WL 4911205, at *4; *see also In re Avena*, Tr. at 37–38 (docket no. 71-2).  These
     cases are, however, factually distinguishable, and none of them address Notes 1 and 2 of the
21   Addendum or the binding effect of bolded and italicized text.  In addition, the discussion in *In re
     Avena* concerning the Addendum and the "discretionary function" exception constitutes dicta.
22   *See supra* note 12.  Finally, in contrast to the authorities on which defendant relies, which were
     resolved in motion practice, the district court in *Hurd* concluded, after a bench trial, that Coast
23   Guard policy "specifically prescribe[d] a course of action" to follow after an operations duty
     officer decided to render aid by employing a pilot boat to investigate a scream for help near the
     entrance of a harbor.  134 F. Supp. 2d at 769.

1  situation.  Def.'s Mot. at 20 (docket no. 69).  Defendant further contends that, if the Coast

2  Guard is inhibited from declaring that no person or vessel is in distress, would-be

3  rescuers might be endangered and Coast Guard resources might be diverted from actual

4  emergencies.  _Id._  Plaintiff's Addendum-based liability analysis raises the specter of the

5  Court becoming improperly embroiled in second-guessing the "difficult and delicate"

6  choices that Coast Guard staff must occasionally make in search and rescue situations.

7  _See Huber_, 838 F.2d at 400.  At trial, defendant will be permitted to present evidence and

8  argument on the issues of whether the Addendum restricts the discretion of Coast Guard

9  personnel and, if not, whether the decisions made on May 2, 2019, in light of the

10  Addendum's guidance, were based on or susceptible to policy considerations.

11  **Conclusion**

12       For the foregoing reasons, the Court ORDERS:

13       (1)     Defendant's Rule 12(b)(1) motion to dismiss, docket no. 69, is DENIED;

14  the Court concludes that it has subject-matter jurisdiction, that plaintiff has adequately

15  pleaded a negligence claim invoking the sovereign-immunity waiver set forth in the

16  SIAA, and that defendant has not met its burden of establishing that the "discretionary

17  function" exception to the waiver applies;

18       (2)     The deferred portion of plaintiff's motion for partial summary judgment,

19  docket no. 72, is DENIED; the Court concludes that genuine disputes of material fact

20  preclude striking defendant's "discretionary function" exception defense, and at trial,

21  defendant may present evidence and argument on the subject to the extent consistent with

22  this Order; and

23

1      (3)     The Clerk is directed to send a copy of this Order to all counsel of record.

2    IT IS SO ORDERED.

3    Dated this 2nd day of February, 2023.

Thomas S. Zilly
United States District Judge